## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

KEYES HELIUM COMPANY, LLC, a
Colorado limited liability company, and
CERTAIN UNDERWRITERS AND
CERTAIN INSURANCE COMPANIES
SUBSCRIBING TO POLICY NO.
B1740200667000,

                Plaintiffs,

v.

United States of America,

                Defendant.

No. 2:22-CV-224

---

## COMPLAINT

---

Plaintiff Keyes Helium Company, LLC ("Keyes"), together with Certain Underwriters and Certain Insurance Companies who are underwriting syndicates at Lloyd's and insurance companies created or incorporated under the laws of the United Kingdom, the United States of America, and/or other foreign nations, that subscribe to policy No. B1740200667000 (collectively referred to as "Subrogated Insurers") (Subrogated Insurers and Keyes are collectively referred to as "Plaintiffs"), bring this complaint against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1) and Administrative Procedures Act, and state as follows:

## NATURE OF THE ACTION

1.     This case concerns the Bureau of Land Management's ("BLM") negligence in operating the crude helium enrichment unit at the Cliffside Gas Storage Facility outside of Amarillo in Potter County, Texas, and the damages caused to Keyes and its helium refinery facilities on the BLM's helium system as a direct result.

2.     This lawsuit also challenges BLM's final agency action under the Administrative Procedures Act, which is BLM's State Director Review decision that denied Keyes's request to BLM for reimbursement and compensation for the full amount of helium lost due to BLM's actions and inactions.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this claim for monetary damages against the United States pursuant to 28 U.S.C. § 1346(b)(1).

4.     Plaintiffs have exhausted all possible administrative relief they can seek related to their FTCA and APA claims. Plaintiffs have sought all available administrative relief, filed all required administrative forms with each of the relevant agencies of the United States of America, and have been denied all possible available administrative relief. As a result, Plaintiffs' administrative claims have been denied pursuant to 28 U.S.C. § 2675(a).

5.     A substantial portion of the acts and/or omissions giving rise to the claims occurred in the Northern District of Texas. Venue is therefore appropriate under 28 U.S.C. §§ 1391(b) and 1402(b).

2

## PARTIES

6.     Plaintiff Keyes Helium Company, LLC is a small, privately owned Colorado limited liability company whose principal place of business is 910 Louisiana Street, Suite 2400, Houston, Texas 77002. Keyes owns a helium refinery in Keyes, Oklahoma.

7.     Keyes is an independent refiner of helium resources into liquified helium for its customers.

8.     Plaintiffs Certain Underwriters and Certain Insurance Companies are underwriting syndicates at Lloyd's or insurance companies created or incorporated under the laws of the United Kingdom, the United States of America, and/or other foreign nations, subscribing to policy B1740200667000. The policy provides insurance coverage to Keyes for certain losses relating to the Keyes Helium Refinery located in Keyes, Oklahoma. The Insurers, each for their selves and no other, severally, not jointly, based only on their own respective percentage of interest, are subrogated, in whole or in part, to those causes of action and/or claims for relief pleaded herein on behalf of Keyes.

9.     Defendant United States of America operates and maintains a helium storage reservoir, enrichment plant, and pipeline system through the BLM. The BLM is a bureau within the U.S. Department of the Interior and is charged with administering the federal helium program.

## BACKGROUND

### I.     Legal Framework

#### A.     Federal Tort Claims Act

10.     The FTCA provides a limited waiver of United States' immunity from suit, allowing claims for damages for injury or loss of property caused by the negligent or wrongful act or omission of any employee of the United States while acting in the scope of their office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act occurred. 28 U.S.C. § 1346(b).

#### B.     Administrative Procedures Act

11.     The APA allows persons and organizations to challenge final agency actions in federal court. 5 U.S.C. §§ 702, 704.

12.     The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. 702.

13.     "[A]gency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. 551(13).

14.     The APA provides that a court shall hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

15.     The APA also allows an affected party to challenge final agency actions in federal court. 5 U.S.C. §§ 702, 704.

**C.     Federal Helium Program**

16.     The BLM operates and maintains a helium storage reservoir, enrichment plant, and pipeline system near Amarillo, Texas that supplies approximately 40 percent of domestic demand of helium.

17.     The Federal Helium Program consists of the Federal Helium Reserve, the Federal Helium Pipeline, the Cliffside Field, the Crude Helium Enrichment Unit, and various other infrastructures owned, leased, and/or managed by the BLM for extracting, storing, managing, or refining federal and privately held helium.

18.     As of October 5, 2017, private entities stored approximately 3.6 billion cubic feet of helium in the federal system.

19.     The Helium Stewardship Act of 2013 ("HSA") sought to "amend the Helium Act to complete the privatization of the Federal helium reserve in a competitive market fashion that ensures stability in the helium markets while protecting the interests of American taxpayers. . . ." HELIUM STEWARDSHIP ACT OF 2013, 113 P.L. 40, Synopsis.

20.     The HSA provides for the auction and non-allocated sale of federal helium to qualified bidders. HSA Section 6.

21.     The HSA provides that the Secretary of the Interior shall "allow any person or qualified bidder to which crude helium is sold or auctioned under section 6 to store helium in the Federal Helium Reserve; and establish a schedule for the transportation and

delivery of helium using the Federal Helium System that . . . ensures timely delivery of helium auctioned pursuant to section 6(b)(2)." HSA Section 5(e).

22.     The HSA further provides that the Secretary is to offer crude helium for sale under such terms and conditions as the Secretary determines necessary to minimize market disruption. HSA Section (6)(b)(1).

## II.    Statement of Facts

### A.    Helium Gas

23.     Helium is a critical non-renewable natural resource. Despite being the second most abundant element in the universe, helium's property of being "lighter than air" means that it eventually escapes the Earth's atmosphere and becomes unavailable for future use. The BLM plays a key role in the careful management and stewardship of the nation's important helium resource.

24.     The United States is one of four countries that possesses significant helium reserves. The other three countries are Russia, Qatar, and Algeria.

25.     Since the 1920's, the federal government has been aware of helium's strategic value and has engaged in legislation devoted to the issue of helium conservation and stewardship. Initially, the federal government invested in it for its properties as a "lifting gas" for the Department of Defense. Today, helium plays an important role in medical imaging (MRIs), space exploration, military reconnaissance, missile purging and pressurizing, nuclear reactors, underwater diving, metal welding, and fiber optics manufacturing.

6

26.     The United States is currently the largest producer of helium, both from private extraction facilities and from the BLM Cliffside Field. The only other significant country with production is Qatar. Algeria, Russia, and Australia produce smaller amounts of helium to the global market.

**B.     BLM's Helium Program**

27.     The Federal Helium Program began in 1910, when the federal government, realizing helium's potential for defense purposes, contracted for the construction of three small experimental helium facilities in Texas through the Bureau of Mines ("BOM").

28.     The United States Navy constructed a full-scale helium production facility in Fort Worth in the early 1920's. That facility was eventually transferred to the BOM through the Helium Act of 1925.

29.     The 1925 Act also declared helium a critical war mineral, tightly controlled its production, and curtailed exports.

30.     The Federal Helium Program was further expanded in the Cold War, and an amendment to the 1925 Act in the 1960s resulted in the establishment of the Bush Dome Reservoir near Amarillo, Texas and mandated the buildup of a strategic reserve of federal helium and expansion of the federal helium system.

31.     By the 1970s, the federal government realized that its stockpiled supply of helium (35 billion cubic feet) greatly exceeded its demand, and that its efforts to stockpile helium created a large and growing debt to the Treasury.

32.     In 1996, Congress enacted the Helium Privatization Act of 1996, which ceased the government's helium refining facilities, and required federal purchasers of

helium to purchase through the BLM via private firms under contract to purchase from the BLM. The 1996 Act ordered the sale of the majority of the helium in the federal storage system to federal and private purchasers at a price sufficient to recoup the taxpayer's investments and to pay off the substantial debt incurred in stockpiling helium.

33.    Through the 1996 Act, four very large private companies purchased helium refineries connected to the federal helium system. Under the 1996 Act, these four major companies were the only companies allowed to purchase federal helium. Given the government's huge reserves, the 1996 Act placed a large reservoir of helium in the control of four private companies.

34.    Under the 1996 Act, the BLM was required to sell the federal helium reserve as to not significantly upset the private helium market, and at a price sufficient to recoup the taxpayer's investment. In addition, the BLM was to complete the sale of the remaining reserves by January 1, 2015.

35.    Although Congress mandated that the BLM sell helium without significant price disruption, the global market for helium changed such that, by 2013, the four major companies with refining facilities connected to the federal system were able to purchase federal helium at a much lower price than the global market.

36.    In addition, these four major companies achieved a significant advantage by having a steady source of helium during a time of great volatility in the global markets.

37.    Although federal helium sales eventually expanded to companies other than the initial four major refiners connected to the federal system under amendments to the

1996 Act, non-refiners had difficulty accessing their stored helium because they had to go through one of the four major refiner companies in order to access refined helium.

## C.    2013 Helium Stewardship Act

38.    In light of the highly anti-competitive market created by the 1996 Act and a large reserve of helium despite the impending January 1, 2015 deadline, Congress enacted the 2013 Helium Stewardship Act with the stated purpose "[t]o amend the Helium Act to complete the privatization of the Federal helium reserve in a competitive market fashion that ensures stability in the helium markets while protecting the interests of the American taxpayer." 113 Public Law 40, Synopsis.

39.    One of the purposes of the HSA was to resolve the "monopoly system" at play prior to the HSA, where four refiners completely dominated the market for federal helium. *See* House Committee on Natural Resources, Report to accompany H.R. 527, Report No. 113-42, p. 10. The previous legislation "locked in allotment capacity on the [federal helium] pipeline to specific refiners. These allotments have stifled competition and left only a small handful of companies as the gatekeepers of the helium from the Federal Reserve." *Id.* at 12.

40.    The HSA intended to "allow access to the pipeline system for new refining capacity to allow greater competition and ensure a better price [for Federal helium] for the taxpayer." *Id.* This intent was reiterated by Mr. Tim Spisak, then Deputy Assistant Director for Minerals and Realty Management for the BLM, who testified at the House Committee on Natural Resources Oversight Hearing on H.R. 527 (the HSA), that "[t]he Department [of the Interior] and BLM are committed to ensuring that the public receives a fair return

on publicly owned energy and related resources." Statement of Timothy R. Spisak before the House Committee on Natural Resources, February 14, 2013.

**D.    Helium Contract Between the BLM and Keyes**

41.    On August 31, 2020, Keyes and the BLM, through Samuel R.M. Burton, Field Manager for the BLM Amarillo Field Office, executed a new replacement contract titled "Contract for the Storage and Delivery of Helium Between the United States Department of the Interior, Bureau of Land Management and Keyes Helium Company, LLC" ("BLM Delivery Contract").

42.    The BLM Delivery Contract defines "helium-gas mixture" as "the gaseous product contained in the Federal Helium System which is comprised predominantly of helium together with other chemical constituents of natural gas." Article I, Section 1.12, BLM Delivery Contract.

43.    BLM requires persons delivering and storing helium on the pipeline to inject helium-gas mixture of "at least 65 percent helium by volume," Article II, Section 2.1(a)(1), and "no more than 3 percent methane (CH4) by volume." Section 2.1(a)(4).

44.    The BLM Delivery Contract requires the BLM, among other things, "to deliver to Person [Keyes] during the term of this Contract as much of the volume of helium owned by the Person and stored by the United States in the Federal Helium System that Person requests . . . ." Article II, Section 2.3. The BLM Delivery Contract specifies that the BLM is required to deliver helium to Keyes "in a helium-gas mixture containing not less than 50 percent helium by volume . . . under conditions that permit suitable measurement and analysis specified by Article VI." Section 2.3(a) (emphasis added).

45.    The BLM exclusively and solely operates and maintains a helium storage reservoir, enrichment plant, and pipeline system that comprise the Federal Helium System,[1] including the BLM pipeline that delivers helium under the BLM Delivery Contract.

46.    Upon processing through the BLM's Crude Helium Enrichment Plant, the average makeup of processed helium is 78% helium, 21% nitrogen, and less than 1% methane. *See* BLM Amarillo Field Office "Helium Fast Facts" sheet, available at: https://www.blm.gov/sites/blm.gov/files/Helium%20Fast%20Facts_508.pdf  (last  visited November 11, 2022).

### E.   Multiple Failures and Issues at the BLM Crude Helium Enrichment Unit

47.    BLM's mismanagement of the federal helium system has resulted in multiple maintenance issues and failures to train and protect employees.

48.    In July of 2021, the BLM implemented what was intended to be a four-week "Safety Shutdown" of the gas plant to address overdue repairs and safety training for plant personnel, an OSHA Audit, and a subsequent unintended release of natural gas liquids into the helium stream from the plant in April of 2021. The actual shut down extended nearly double the estimated time, through late September of 2021.

49.    In January of 2022, the Occupational Safety and Health Administration ("OSHA") issued the BLM 21 of unsafe working conditions related to its Cliffside Helium Enrichment Unit, including failing to train workers regarding key functions and safety

---

[1] *See* BLM Helium Program overview, available at: https://www.blm.gov/programs/energy-and-minerals/helium#:~:text=The%20BLM%20operates%20and%20maintains,Helium%20Stewardship%20Act%20of%202013 (last visited on November 11, 2022).

issues at the Unit, process safety management failures, and other safety violations. Had the facility been operated by a private entity, rather than the BLM, OSHA indicated the violations would have carried a penalty of over one million dollars.

50.     Also in January of 2022, the BLM implemented another shut down as a result of multiple safety incidents, including an "unusual liquid" emitting from a portion of the plant and a major electrical failure. The BLM finally returned the facility to service in mid-June of 2022 with a new third-party contractor operating the facility on the BLM's behalf.

### E.     The BLM's Injection of Methane into Keyes' Facility

51.     Keyes' FTCA claim arises out of the BLM's negligent operation of the Federal Helium Pipeline and related facilities. Rather than delivering crude helium, the BLM's negligent operations resulted in the delivery of a large methane slug that significantly damaged Keyes' helium refinery, and completely destroyed and rendered unusable Keyes crude helium product.

52.     The BLM shut the Cliffside Plant down due to an issue with the separator on or about December 10, 2020. On the morning of December 11, 2020, the BLM resumed operations.

53.     On December 15, 2020, starting at 3:21pm, the BLM began delivering crude helium into Keyes refinery system with unacceptable and damaging levels of methane—6.44%—more than double the amount generally accepted in the industry ("no more than 3 percent") as evidenced by the BLM Delivery Contract and the BLM's own documentation. See 79 Fed. Reg. 42809, defining "crude helium" as "a partially refined gas containing

about 70 percent helium and 30 percent nitrogen. However, the helium concentration may vary from 50 to 95 percent."

54.     Keyes immediately notified Mr. Burton at the BLM of the methane contamination. On December 15, 2020, the BLM acknowledged to Keyes that the BLM delivered a slug of methane into the pipeline upon startup of the BLM Facility.

55.     In an e-mail from the BLM employee Mark Musick, the BLM notified Keyes and other Shippers on December 15, 2020, at 6:03pm that "there is a slug of high methane gas in the BLM helium pipeline" and that "[t]he slug of off-spec gas was detected passing through Oklahoma on Tuesday 12/15/2020." Mr. Musick also stated in this email that the "BLM Helium Operations estimates the size of this slug to be approximately 150 MCF." *Id*.

56.     Based upon Keyes' facilities' capacity and the high amount of methane received, Keyes estimates that the size of the methane slug was significantly greater than 150 MCF.

57.     The BLM continued to deliver tainted crude helium with increasing levels of methane. The methane reached a maximum of 62.67% of the purportedly "crude helium" stream by volume at 4:45pm, with levels still above the acceptable 3% threshold at 4.06% methane at 5:49pm. This delivery is referred to as the "BLM's Negligent Delivery."

58.     Keyes records, using on-site calibrated measurement equipment (verified and accepted by the BLM, and more specifically verified by the BLM on December 2, 2020, prior to the mid-December negligent methane delivery) detail that the BLM's delivered crude helium included methane concentrations in excess of 60% of the volume delivered.

59.    During the BLM's Negligent Delivery, the total volume of tainted crude helium delivered by the BLM into the Keyes refinery and unusable as waste helium is 967.27 MCF.

60.    The BLM's Negligent Delivery of unacceptably high levels of methane are documented by the gas analysis provided by the gas chromatograph BLM required to be installed   at Keyes' helium refinery. The BLM calibrated and inspected the gas chromatograph for the Keyes' refinery on December 2, 2020.

61.    Upon the BLM's Negligent Delivery of the corrupted helium stream, Keyes immediately reduced the feed rate into the plant in an effort to mitigate damages and allow the facility's purifier system to clean and purge the high methane content. Keyes transported the corrupted crude helium to waste tanks.

**F.    Property Damages Suffered by Keyes from December 2020 Event**

62.    Anything but nitrogen and helium running through a helium refinery is damaging, and methane is particularly so, due to the extremely low temperature at which helium is processed and further refined by Keyes. Keyes' purifier is cooled by liquid nitrogen to a temperature of -320 Fahrenheit to adequately process its helium stream. Methane freezes at -280 Fahrenheit.

63.    The destructive nature of high levels of methane is acknowledged within the BLM contract with which all suppliers to the BLM helium system must comply. That contract specifies that no supplier to the BLM system can deliver crude helium product to the BLM system with a methane content of three percent or higher.

64.    On December 15, 2020, the BLM delivered contaminated crude helium into the Keyes refinery with an unacceptable level of methane content, as high as 62.6724%. The average makeup of crude helium leaving the BLM CHEU has historically not contained greater than 1% methane. Thus, this stream contained more than sixty times the normal average level of methane.

65.    Despite diligent efforts by Keyes to avoid an impact, this gas stream with an extremely high level of methane inundated, contaminated, and damaged the entire Keyes Helium Facility, including the purifier and the liquefier.

66.    The BLM's delivery of tainted crude helium caused Keyes to incur significant costs and expenses to repair and clean its helium refinery system.

67.    On December 16, 2020, Keyes had to shut down its entire refinery due to failure of the purifier. This shut down was solely and directly caused by the incredibly high concentrations of methane introduced into the pipeline by the BLM, and that inundated and overwhelmed the purifier system. During the next three weeks, Keyes worked diligently to bring the refinery back into operation, including attempting to clean the purifier utilizing a warm nitrogen purge.

68.    On December 22, 2020, Keyes attempted to restart the Helium Plant, and began accepting crude helium from the BLM. However, continued contamination from the BLM's Negligent Delivery forced a plant shutdown on December 24, 2020, and all helium received between December 22 and December 24, 325.2 MCF, was sent to waste tanks as unusable.

69.     During this time period, Keyes determined that despite Keyes best efforts to contain the contamination, the methane slug delivered by the BLM breached the entire refinery system, including contaminating the liquefier system. This damage required extensive equipment repair and replacement by Keyes, including removing, repairing, and re-installing the refinery turbines and cleaning the entire refinery system using specialized high pressure chemical vapors and a high-volume nitrogen purge.

### G.     February 2021 Off-Spec Event

70.     In February 2021, the BLM again delivered off spec helium with damaging levels of methane. On February 26, 2021, Keyes detected high levels of methane in the BLM delivery, at which time Keyes diverted the helium to waste tanks to avoid further contamination of its plant.

71.     Keyes' efforts to resume operations occurred on April 22, 2021, after which Keyes was able to resume operations upon the BLM's allocation release on May 4th. However, upon returning to service it was determined that the plant's helium turbines that were damaged by the BLM's methane contamination were still not functioning properly and had to be further examined and repaired.

### H.     Keyes Exhausts its Administrative Remedies

72.     On April 29, 2021, Keyes received a decision letter from Samuel Burton, denying Keyes' request for reimbursement for losses incurred as a result of the Negligent Delivery.

73.     On May 25, 2021, Keyes simultaneously filed an administrative claim under the FTCA with Form 95 for Claims of Property Damages concurrently with a request for

State Director Review ("SDR") with the BLM. The factual narratives provided in its SDR letter were incorporated by reference into the Form 95 Claim submission. *See* BLM Claims Manual 1386 at 1386.05.G. These facts, correspondence, and communications are incorporated herein by reference.

74.    On June 30, 2021, Keyes made an oral presentation to BLM staff and counsel at the Department of the Interior and the BLM regarding its request for SDR. In response to several questions and information requests at that meeting, Keyes submitted a Supplement to its SDR Request on July 8, 2021, providing additional clarification and evidentiary support for its claim for damages as a result of the BLM's negligence.

75.    On December 16, 2021, Keyes received a letter from the BLM noting that it affirmed the BLM's April 29, 2021 decision to deny any relief to Keyes as a result of the BLM's negligence, with one small exception.

76.    The BLM admitted that it had delivered "off-spec" helium when it delivered helium-gas mixture on December 15, 2020, and February 27, 2021, containing not less than 50 percent helium by volume. It therefore agreed to credit to Keyes' storage account less than 10 MCF of net helium. BLM denied Keyes' claims for lost helium from the initial helium volumes contaminated by the slug of methane, the volumes lost in purging and repairs necessary to repair its plant as a result of the BLM's negligence, as well as lost tolling revenue, and all amounts spent to clean and repair its facilities.

77.    In total, BLM agreed to credit approximately 0.002% of the helium actually lost to Keyes as a result of BLM's negligent operations.

78.     The BLM's letter, received December 16, 2021, specifically stated that it "only addresses the SDR and does not address the Claim for Property Damages under the FTCA."

79.     On May 20, 2022, the United States informed Keyes, through its counsel, that its FTCA claim was denied. Keyes received that notification on May 25, 2022.

**I.      Economic Damages Suffered by Keyes**

80.     The BLM's Negligent Delivery caused significant economic damages to Keyes. Keyes also suffered significant economic damages resulting from the shut-down of its helium refinery to repair the equipment damage caused by the BLM's Negligent Delivery. These damages include repair costs, loss of Tolling Revenue and Tolling Fees, and loss of revenue from Keyes' inability to deliver helium to its customers. These damages are all a direct result of the BLM's Negligent Delivery.

81.     The BLM's Negligent Delivery of the methane-tainted crude helium product resulted in Keyes incurring expenses for repairs to the Keyes refinery including: costs incurred to repair turbines and other equipment, to purge and flush the facility with nitrogen and other chemicals, hiring of cleaning consultants and rental of cleaning equipment, purge, and repair damaged equipment, and replacement of contaminated charcoal filters.

82.     Keyes also incurred damages as a result of lost helium, lost revenue from contaminated helium, and plant downtime. Downtime is particularly damaging as the Federal Helium Plant frequently operates on an allocation system as demand on the system regularly exceeds the capacity of the federal system to supply its customers.

## FIRST CAUSE OF ACTION

## NEGLIGENCE[2]

83.    Plaintiffs incorporate by reference each of the allegations set forth above.

84.    The United States of America, acting through the federal agencies, employees and officials referenced above had a duty to Keyes to act with ordinary care and prudence so as not to cause harm, injury, or damages to Keyes, under the Helium Stewardship Act, regulations passed thereunder and the contractual relationship. The Defendant had a duty to exercise reasonable, care, competence and skill in, among other things, (1) performing services relating to the delivery of helium in accordance with industry standards, governmental standards and the duties imposed by the unique contractual relationship between the parties; and (2) obtaining and/or disclosing information to pipeline users regarding the unacceptable and damaging levels of methane in the helium provided by Defendants.

85.    The Defendant breached its duties by engaging in the negligent and careless acts and/or omissions described in greater detail above, including, but not limited to,

       a.    Failing to deliver a helium-gas mixture in accordance with internal and applicable industry standards;

---

[2] An action is pending in the Federal Court of Claims with the below mentioned tort claims plead. (*See* Notice of Related Case, filed contemporaneously with this Complaint.)  The Fifth Circuit has held that if the claim is to be found to be a "breach of contract" rather than tort claim, the proper venue is the Court of Federal Claims. *See Blanchard v. St. Paul Fire & Marine Ins. Co.*, 341 F.2d 351, 359 (5th Cir. 1965). These tort claims are being plead in this district for preservation purposes pending a decision by the Federal Court of Claims on whether jurisdiction exists to hear Plaintiffs' various tort claims.

b.  Failing to follow internal standards by delivering crude helium with methane levels more than double the amount generally accepted in the industry;

c.  Failing to ensure the helium-gas mixture contained appropriate levels of methane prior to delivery of same to Keyes;

d.  Failing to exercise reasonable care in obtaining or communicating information to parties connected to the federal helium system regarding the unacceptable and damaging levels of methane in the helium;

e.  Failing to warn Keyes of the unacceptable and damaging levels of methane in the helium, as well as the detection of same;

f.  Failing to exercise reasonable care by allowing continuous delivery of contaminated crude helium into the Keyes refinery; and

g.  Failing to adequately train, maintain and supervise the governmental employees, helium crude line equipment and gas composition detection equipment.

86.    The negligent acts and omissions of the United States of America caused damage to Keyes, including but not limited to, costs for repair of the damaged refinery, lost helium, delayed production income, business interruption and other damages, losses and expenses, in an amount to be determined.

## SECOND CAUSE OF ACTION

## NEGLIGENT MAINTENANCE AND OPERATION[3]

87.     Plaintiffs incorporate by reference each of the allegations set forth above. The United States of America, acting through the federal employees and officials referenced above, had a duty to maintain and operate the helium facility in a reasonable manner so as to not cause harm, injury, or damages to Keyes.

88.     By failing to maintain and/or operate the helium facility in a reasonable manner so as to avoid such harm, injury, or damages, as set forth in greater detail above, the United States, acting through the federal employees and officials referenced above, failed to act with ordinary care and breached its duties to maintain and operate the helium facility in a reasonable manner.

89.     As a direct and proximate result of the negligent failure to maintain and/or operate the helium facility, as set forth in greater detail above, Keyes suffered significant and repeated damages and/or losses including physical property damages and loss of business.

90.     Under the FTCA, the United States is liable to Keyes for the negligent maintenance and operation of the helium facility.

## THIRD CAUSE OF ACTION

## NEGLIGENCE – FAILURE TO NOTIFY

91.     Plaintiffs incorporate by reference each of the allegations set forth above.

---

[3] The Second and Third Cause of Action are derivative of the primary negligence claim and are reiterated in an abundance of caution.

92.     The United States of America, acting through the federal employees, agencies, federal employees and officials referenced above had a duty to notify and/or warn Keyes of any potential threat of harm, injury, or damages including, but not limited to, an increase of methane gas in the helium system that could result in irreparable harm, injury, or damage to Keyes' helium facility.

93.     By failing to notify and/or warn Keyes of the increase of methane gas in the helium system, the United States, acting through the federal employees, agencies, and officials referenced above, failed to act with ordinary care and breached its duties to notify and/or warn Keyes. In fact, it was Keyes who initially notified the BLM of the methane excursion in the pipeline on December 15, 2020.

94.     As a direct and proximate result of the negligent failure to notify and/or warn Keyes of the increase in methane gas in the helium system, Keyes' facility suffered significant and repeated damages and/or losses including physical property damages and loss of business.

95.     Under the FTCA, the United States is liable to Keyes for the BLM's negligent failure to notify and/or warn Keyes of the increase in methane gas in the helium system.

## FOURTH CAUSE OF ACTION

## APA VIOLATION – BLM'S SDR DECISION

96.     Plaintiffs incorporate by reference each of the allegations set forth above.

97.     The BLM SDR decision is a final agency action. BLM's decision is in immediate effect upon issuance. BLM did not compensate Keyes the full amount of helium lost due to BLM's actions and inactions.

98.    BLM's decision to not compensate Keyes the full amount of helium is arbitrary, capricious, and not supported by the administrative record in violation of the APA. 5 U.S.C. § 706(2).

## FIFTH CAUSE OF ACTION

## APA VIOLATION

99.    Plaintiffs incorporate by reference each of the allegations set forth above.

100.    The stated purpose of the HSA was to complete the privatization of the federal helium market "in a competitive market fashion that ensures stability in the helium markets while protecting the interests of American taxpayers. . . ." HELIUM STEWARDSHIP ACT OF 2013, 113 P.L. 40, 127 Stat. 534, Synopsis.

101.    The HSA directs the Secretary of the Interior to "ensure the timely delivery of helium auctioned" under the HSA. HSA Section 6.

102.    BLM's Negligent Delivery has prevented the timely delivery of Keyes's helium, damaged its plant, thereby preventing Keyes from having its helium produced or refined in monthly increments.

103.    BLM's decision to deny Keyes helium amounts that were corrupted by BLM's negligent action was arbitrary, capricious, and not in accordance with law and should be set aside under the APA because they are contrary to Congressional intent, and the APA statute. 5 U.S.C. § 706(2).

104.    Therefore, Plaintiffs request that this Court reverse and remand BLM's decision to deny compensation for loss of helium and plant damage.

## SIXTH CAUSE OF ACTION

## VIOLATION OF THE FIFTH AMENDMENT, TAKING OF PROPERTY WITHOUT JUST COMPENSATION

105.    Plaintiffs incorporate by reference each of the allegations set forth above.

106.    The actions of the federal employees and officials referenced above are contrary to the Fifth Amendment to the United States Constitution.

107.    The United States' actions constitute a physical taking of Keyes's property and a regulatory taking depriving Keyes of the economic value of its BLM Delivery Contract for which compensation is due within the meaning of the Fifth Amendment to the United States Constitution.

108.    The United States' actions impaired Keyes's property rights and interests pursuant to its BLM Delivery Contract, without due process.

109.    The United States Constitution requires that the United States pay just compensation for a taking of property in violation of the Fifth Amendment to the United States Constitution.

110.    To date, the United States has paid nothing to Keyes for its valuable helium lost as a result of the acts and omissions of the United States acting through BLM.

111.    Rather than allocate replacement helium volumes to Keyes, the United States allocated these helium volumes to other companies on the BLM helium system.

112.    Plaintiffs have been damaged as a result of the United States' conduct in amount to be determined, equal to the just compensation due under the Fifth Amendment.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      Issue an order granting Plaintiffs all available compensatory damages;

2.      Issue an order granting Plaintiffs appropriate punitive damages as authorized by federal statutes, if applicable;

3.      Issue an order reversing BLM's decision denying Keyes' request for compensation and reallocation of lost helium;

4.      Award judgment in favor of Plaintiffs equal to the just compensation owing to Plaintiffs for the taking of their property, together with interest thereon at the legal rate from the date of the taking;

5.      Issue an order finding that Defendant's actions deprived Plaintiffs of a property interest unlawful and that such action constitutes a taking in violation of the Fifth Amendment to the United States Constitution;

6.      Issue an order granting such other relief whether injunctive, declaratory, or otherwise as justice may require;

7.      Award Plaintiffs' costs and attorney's fees as authorized by federal statutes; and

8.      Award Plaintiffs any other such relief as the Court may deem just and appropriate.

Dated this 18th day of November 2022.

Respectfully submitted,

/s/ Philip Vickers
Philip Vickers
Texas Bar No. 24051699
Katherine R. Hancock
Texas Bar No. 24106048
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, Texas 76102
Telephone: (817) 877-2800
Facsimile: (817) 877-2807
E-Mail: pvickers@canteyhanger.com
E-Mail: khancock@canteyhanger.com
*Counsel for Plaintiffs*

/s/ Bret A. Sumner
Bret A. Sumner (*pro hac vice pending*)
Texas Bar No. 24122836
BEATTY & WOZNIAK, P.C.
1675 Broadway Street, Suite 600
Denver, Colorado 80202
Telephone: (303) 407-4499
Facsimile: (303) 407-4494
E-Mail: bsumner@bwenergylaw.com
*Counsel for Keyes Helium Company,*
*LLC*

/s/ Samuel J. Dolan
Samuel J. Dolan (*pro hac vice pending*)
Texas Bar No. 24077193
Caroline E. Bossier (*pro hac vice*
*pending*)
Texas Bar No. 24110669
HALL MAINES LUGRIN, P.C.
2800 Post Oak Boulevard, Suite 6400
Houston, Texas 77056
Telephone: (713) 871-9000
E-Mail: sdolan@hallmaineslugrin.com
E-Mail: cbossier@hallmaineslugrin.com
*Counsel for Certain Underwriters*